**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **EILEEN MAYFIELD,** | ) | |
| | ) | |
| **Plaintiff**, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | **No. 03-cv-2234** |
| | ) | |
| **MONTGOMERY COUNTY** | ) | |
| **CORRECTIONAL FACILITY, et al.,** | ) | |
| | ) | |
| **Defendants**. | ) | |

---

**MEMORANDUM OPINION AND ORDER**

**RUFE, J.**                                                                **February 12, 2009**

Plaintiff Eileen Mayfield brings this action against Defendants Montgomery County ("Montco"), Julio Algarin and Lawrence Roth alleging she was sexually harassed during her term of employment at Montgomery County Correctional Facility ("MCCF"), and that she was criminally prosecuted because she sought legal recourse based on the harassment. Before the Court are Defendants' Motion for Partial Summary Judgment [Document No. 106], Plaintiff's Response [Document No. 109] and Defendants' Reply [Document No. 110]. For the reasons that follow, the Court will grant Defendants' Motion in part and deny in part.

**I.     FACTUAL AND PROCEDURAL BACKGROUND[1]**

Plaintiff worked as a correctional officer ("CO") at MCCF beginning in 1982 until her

---

[1] Defendants do not move for summary judgment on Plaintiff's claims under Title VII or those under the Pennsylvania Human Relations Act. Thus, facts relevant only to these claims are not included *infra*.

1

termination on October 19, 2000.[2]  During the time period relevant to this action, Plaintiff was assigned to the Commissary, a facility within MCCF that sells personal items to inmates and is staffed by both COs and inmates.[3]  Also during that time period, Defendant Roth was warden of MCCF, Defendant Algarin the deputy warden.[4]  At some point, Plaintiff was placed in charge of the day-to-day operations of the Commissary.[5]

In late February of 1999, it came to light that from late 1998 to early 1999, Plaintiff had exchanged letters with Gene White, an inmate who worked in the Commissary.[6]  On or around February 25, 1999, White was written up by CO Mikhail Dillman for stealing underwear while working in the Commissary.[7]  White told Captain Albert L. Ottinger that Plaintiff had given him the underwear, which Plaintiff denied.[8]  After White was found guilty of the theft at his due process hearing, he gave Captain Ottinger the letters Plaintiff wrote him.[9]  Captain Ottinger then gave those original letters to Defendant Algarin,[10] who stated that he kept them in Plaintiff's file until Major

---

[2] Defs.' Reply [Document No. 110] ("Reply") Ex. C (Deposition of Eileen Mayfield, Vol. I, June 20, 2006 ("Mayfield Dep. I")) at 17:22-18:1; Reply Ex. D (Deposition of Eileen Mayfield, Vol. II, June 21, 2006 ("Mayfield Dep. II")) at 455:23-24.

[3] Mayfield Dep. I at 25:17-26:2.

[4] Id. at 46:6-10.

[5] Id. at 96:17-97:1.

[6] Mayfield Dep. I at 53:16-18, 54:20-22, 162:9-23, 178:13-23.

[7] Id. at 126:5-24.

[8] Id. at 128:22-129:7.

[9] Pl.'s Resp. ("Resp.") [Document No. 109] Ex. 6 (Deposition of Albert L. Ottinger, August 29, 2006 ("Ottinger Dep.")) at 11:8-15.

[10] Id. at 12:4-9; 16:1-8.

James Frey requested them.[11]  In her deposition, Plaintiff testified that Defendant Algarin called her into his office on February 26, 1999 and proceeded to yell and curse at her for writing the letters to White.[12]  He told her that White claimed to have had sex with her, which she denied.[13]  Plaintiff stated that no one else was present during this meeting with Defendant Algarin.[14]  Defendant Algarin then put Plaintiff on probation and demoted her, placing CO Mikhail Dillman in charge of the Commissary.[15]

On or about August 10, 2000, Plaintiff filed a complaint against Defendant Algarin under the Pennsylvania Human Relations Act ("PHRA") for sexual harassment.[16]  On August 17, 2000, Plaintiff went to Defendant Roth's office and told him that she had filed suit against Defendant Algarin.[17]  According to Plaintiff, half an hour after her meeting with Defendant Roth, Defendant Algarin asked to speak with her in Defendant Roth's office.[18]  He asked her to withdraw the complaint.[19]  Plaintiff stated that the very next day, Defendant Algarin again asked her to withdraw her complaint.[20]  Plaintiff testified that Defendant Algarin also stated that he had letters saying that

---

[11] Reply Ex. L (Deposition of Julio Algarin, August 2, 2006 ("Algarin Dep.")) at 135:4-23.

[12] Mayfield Dep. I at 139:1-141:16.

[13] Id. at 141:17-142:5.

[14] Id. at 138:19-24, 142:9-11.

[15] Id. at 144:3-5.

[16] Mayfield Dep. II at 393:11-394:16.

[17] Id. at 394:17-395:15.

[18] Id. at 417:5-12.

[19] Id. at 417:22-418:19.

[20] Id. at 420:3-23.

all the inmates who had worked and stolen from the Commissary had actually been given the stolen items by Plaintiff.[21]   In early September, Plaintiff told Defendant Algarin that she was going to continue with the lawsuit and according to Plaintiff, he replied, "Well, I got to do what I got to do."[22] Defendant Algarin denied saying this statement, claiming that he actually said "do what you have to do."[23]   Defendant Algarin also denied ever having asked Plaintiff to withdraw her complaint.[24]

According to Plaintiff's deposition, "Algarin did anything he wanted in [MCCF].  Warden Roth was openly molding [Defendant Algarin] into being the next warden. . . they were so tight."[25] In his deposition, CO Dillman testified that during the first or second week of September 2000, he spoke with Defendant Roth in his office.[26]   CO Dillman stated that Defendant Roth said that "he didn't care what relationship I had with Officer Mayfield there, but if she was my friend, meaning his friend, that he would strongly suggest that she drop the case" and that it was Defendant Roth's understanding that there would be a criminal action.[27]   CO Dillman stated that when he replied that it was up to the "EOC [sic] whether or not there is any kind of criminal action," Defendant Roth responded that he was referring to Officer Mayfield and that he understood that there were letters that would lead to criminal charges.[28]   According to CO Dillman, he assumed that Defendant Roth

---

[21] Id. at 420:24-421:4.

[22] Id. at 421:16-422:19.

[23] Algarin Dep. at 57:3-5.

[24] Id. at 54:11-14.

[25] Mayfield Dep. II at 404:12-17.

[26] Reply Ex. M (Deposition of Mikhail Dillman, August 14, 2006 ("Dillman Dep.")) at 92:17-93:21.

[27] Id. at 96:4-12.

[28] Id. at 96:12-21.

was referring to the Gene White letters and told him that Plaintiff had already been punished for the same.[29]  CO Dillman testified that Defendant Roth "smiled and said that, you know, if she was my friend, again, I would tell her strongly there to think before she does it."[30]  CO Dillman also testified that at some point, Clifton Glenn, an inmate who had also worked in the Commissary and also received letters from Plaintiff, said to him "You guys better watch your back because they're watching you."[31]  CO Dillman believed Glenn was referring to Defendant Algarin and the staff.[32]

On October 2, 2000, Lieutenant Negron found contraband in the cell of inmate Jason Mascione, specifically highlighters, pens, pencils and markers.[33]  Mascione claimed that CO Dillman had given him the contraband.[34]  CO Dillman denied this and was instructed to write a misconduct report on the incident.[35]  After he wrote the report, CO Dillman was informed by Lieutenant Negron that he had determined that CO Dillman had lied about not giving Mascione the contraband.[36]  Lieutenant Negron then filed an Employee Violation Report against CO Dillman for lying to a supervisor dated October 5, 2000.[37]  Contrary to normal procedure, Mascione's misconduct report

---

[29] Id. at 96:22-24.

[30] Id. at 97:1-4.

[31] Dillman Dep. at 210:12-14.

[32] Id.

[33] Reply Ex. O (Misconduct Report: Mascione).

[34] Id.

[35] Id.; Dillman Dep. at 167:16-168:23.

[36] Dillman Dep. at 169:4-13.

[37] Id. at 169:13-15; Reply Ex. N (Employee Violation Report: Dillman).

was never logged in the misconduct log.[38]

On or around October 5, 2000, CO Kathleen Brighter verbally reported to Major Frey that Mascione said Plaintiff had "grabbed his ass."[39]  Major Frey then interviewed Mascione, who stated that Plaintiff "was flirting with him and there was one occurrence where she grabbed him in his buttocks area."[40]  Major Frey then interviewed other inmates who worked in the Commissary, including Clifton Glenn and Nathaniel Bell, ultimately determining that "there was enough substance there that we should have outside agency investigate the matter."[41]  He contacted the county detectives, who assigned Detective Joseph DeAngelo to the case.[42]  Major Frey testified that he mentioned Gene White's name to Detective DeAngelo and turned over to him the original letters from Plaintiff to White.[43]  At some point during his investigation, Major Frey informed Defendant Algarin of the allegations against Plaintiff, but according to Major Frey, Defendant Algarin refused to be involved and told him to report it to Defendant Roth.[44]

After being assigned to the case, Detective DeAngelo conducted an investigation, reviewing Plaintiff's employment file and speaking to Major Frey and CO Brighter.[45]  During her interview

---

[38] Algarin Dep. at 86:21-89:5; Dillman Dep. at 215:11-216:15.

[39] Reply Ex. E (Deposition of Kathleen Brighter, July 27, 2006 ("Brighter Dep.")) at 58:18-59:17; Reply Ex. G (Deposition of James Frey, July 27, 2006 ("Frey Dep.")) at 13:17-19.

[40] Frey Dep. at 14:13-15:3.

[41] Id. at 25:9-15.

[42] Id. at 28:8-29:6.

[43] Id. at 30:21-31:2, 32:22-33:3.

[44] Id. at 20:17-21:2.

[45] Reply Ex. H (Deposition of Joseph DeAngelo, February 28, 2008 ("DeAngelo Dep.")) at 13:6-8, 13:21-14:8, 16:22-17:2.

with Detective DeAngelo, CO Brighter stated that she was having a conversation with Mascione and Preston Minnick when Mascione reported Plaintiff's touching of his buttocks.[46]  Detective DeAngelo also had letters from Plaintiff to Gene White, as well as the letters she had written in the early 1990s to Glenn.[47]   Detective DeAngelo interviewed several inmates, including Bell, Glenn, White, Mascione and John Marburger.[48]  In his deposition, Detective DeAngelo stated that he "never spoke to Warden Algarin . . . [nor] any of the other prison officials concerning my investigation of this case," nor was he, at the time, aware of Plaintiff's pending sexual harassment suit.[49]

Jasper DiSanto, another inmate in MCCF serving a sentence of twenty-nine and a half to fifty-nine and a half months, also gave a statement to Detective DeAngelo.[50]  DiSanto had previously been on work release, but was removed after a July 12, 1999 drug violation.[51]  He later applied for early parole, but it was denied on July 5, 2000 with the issue to be revisited in January of 2001.[52]  On October 19, 2000, DiSanto gave his statement to Detective DeAngelo alleging that Plaintiff had sexually assaulted him.[53]  Defendant Roth, as warden, recommended him for early parole on

---

[46] Reply Ex. F (Montgomery County Detectives Investigation Interview Record: Brighter) at *2; see also Resp. Ex. 8 (Trial Transcript of Commonwealth v. Mayfield, No. 1468-01, October 14, 2004 ("Trial Tr.")) at 111:22-113:3.

[47]  DeAngelo Dep. at 50:21-23; Mayfield Dep. I at 49:7-50:5, 53:2-12.

[48] DeAngelo Dep. at 55:6-10, 100:3-101:14, 113:8-16, 115:19-21.

[49] Id. at 33:9-22, 146:8-16.

[50] Trial Tr. at 129:2-4, 142:12-14.

[51] Id. at 141:3-8, 187:6-7, 188:25-189:8.

[52] Id. at 147:2-10, 190:17-18, 191:10-23.

[53] Id. at 142:12-14, 146:15-17.

7

December 5, 2000.[54]  DiSanto testified at Plaintiff's preliminary hearing on January 10, 2001 and

was paroled just under two months later on March 7, 2001.[55]  He served about thirty-nine months

of his sentence.[56]  The Director of Inmate Services at MCCF testified that when the warden makes

recommendations on an inmate's work release, furlough or early parole, such a recommendation

would carry weight with the Pennsylvania Board of Probation and Parole.[57]  DiSanto had his

probationary hearing on December 21, 2000.[58]

Following Detective DeAngelo's investigation and his issuance of an Affidavit of Probable

Cause, Plaintiff was charged on or around December 2000 with institutional sexual assault for

alleged sexual activity with inmates of MCCF.[59]  With DiSanto, Mascione testified at Plaintiff's

preliminary hearing on January 10, 2001.[60]  While he was on furlough eleven days later, Mascione

got into a fight and was issued a citation.[61]  He failed to report this violation and part of his

punishment was a loss of good time earned.[62]  Mascione sent Defendant Algarin letters on February

8 and February 9, 2001, referencing his testimony in Plaintiff's case and asking that Defendant

---

[54] Id. at 149:20-25, 151:2-24.

[55] Id. at 152:11-20.

[56] Id. at 183:13-16

[57] Id. at 149:11-19, 310:12-15, 312:5-12.

[58] Id. at 146:21-25.

[59] Defs.' Mot. for Summ. J. Pursuant to Fed. R. Civ. P. 56(b) [Document No. 106] ¶ 8; Resp. Mem. in Opp'n to Defs.' Mot. for Summ J. at *1 (agreeing with the factual summary in Defendants' motion); see also Reply Ex. I (Aff. of Probable Cause).

[60] Trial Tr. at 107:19-108:4.

[61] Id. at 103:19-104:5, 107:19-108:4; Algarin Dep. at 97:19-98:10.

[62] Id. at 108:5-10.

Algarin intervene to allow him to keep his good time.[63]   Defendant Algarin recommended that

Mascione be given his good time back.[64]   Preston Minnick also sent a letter to Defendant Algarin

asking for help and writing that he had "put [his] neck on the line."[65]

At Plaintiff's trial, three witnesses, all former inmates of MCCF who knew DiSanto from the

prison barber shop, testified that he was lying.[66]   Louie Ciccarelli testified that DiSanto told him that

he had made up the allegations of sexual assault against Plaintiff because "they promised him

immediate Work Release."[67]   Although DiSanto did not explicitly explain, Ciccarelli believed "they"

referred to those who could get DiSanto work release, including Defendants Algarin and Roth.[68]

William Green testified that DiSanto confided in him that he was making up his claims about

Plaintiff "because he was trying to get out of prison early, early release . . . ."[69]   Finally, John

Marburger testified that DiSanto "said he was going to make up a story so he won't get a violation

hit on his state parole."[70]

The criminal matter against Plaintiff terminated on August 12, 2005 with an order of Nolle

Prosequi entered by the state court upon motion by the Commonwealth, following a criminal trial

that resulted in a hung jury.  Plaintiff filed her first motion to amend/correct her Complaint on March

---

[63] Algarin Dep. at 97:1-18, 99:13-100:10.

[64]  Trial Tr. at 106:17-22.

[65] Algarin Dep. at 110:15-24.

[66] Trial Tr. at 246:24-247:9, 247:18-21, 256:19-257:2, 287:7-13.

[67] Id. at 248:4-249:6.

[68] Id. at 248:17-22, 252:17-253:16.

[69] Id. at 258:7-9.

[70] Id. at 287:18-19.

2, 2007.[71]  In a March 2, 2007 Order, the Court dismissed this motion without prejudice and stayed the case.[72]  Plaintiff filed a notice of intent to move for leave to amend her Complaint on March 15, 2007.[73]  On July 4, 2007, Plaintiff filed a motion for leave to amend her Complaint, as well as a Proposed Amended Complaint.[74]   Then, without a Court ruling, Plaintiff filed an Amended Complaint on July 9, 2007.[75]  On August 9, 2007, the Court approved a stipulation between the parties that the Amended Complaint be withdrawn without prejudice  until the Court decided Plaintiff's Motion for Leave to Amend.[76]  On August 20, 2007, the Court granted in part and denied in part Plaintiff's Motion for Leave to Amend,[77] and Plaintiff filed her Amended Complaint on August 23, 2007.[78]

Plaintiff voluntarily withdrew all claims against Timothy Woodward and Joseph DeAngelo on March 9, 2008.[79]  On July 2, 2008, the Court granted in part and denied in part Defendants' Motion to Dismiss the Amended Complaint.[80]  Plaintiff's remaining claims include a Title VII claim against Defendant Montco, PHRA claims against Defendants Montco and Algarin, 42 U.S.C. § 1983

---

[71] Mot. for Leave to Am. Compl. [Document No. 65].

[72] Order, March 2, 2007 [Document No. 69].

[73] Notification of Intention to File a Mot. for Leave to Am. the Compl. or File a Separate But Related Compl.  [Document No. 70].

[74] Mot. for Leave to Am. Compl. [Document No. 75]; Am. Compl. [Document No. 76].

[75] Am. Compl. ("Am. Compl. I") [Document No. 78].

[76] Stip. [Document Nos. 79, 81]

[77] Order, August 20, 2007 [Document No. 82].

[78] Am. Compl. ("Am. Compl. II") [Document No. 83].

[79] Order, March 14, 2008 [Document No. 94].

[80] Mem. Op. and Order, July 2, 2008 [Document No. 98].

claims against Defendant Algarin and Roth for violations of Plaintiff's First and Fourteenth Amendment rights,[81] as well as claims for civil rights conspiracies under 42 U.S.C. §§ 1985 and 1986 against Defendants Algarin and Roth.[82]  Defendants Algarin and Roth now move for partial summary judgment on Plaintiff's claims against them under §§ 1983, 1985 and 1986.[83]  The Court has carefully reviewed Defendants' Motion for Summary Judgment, Plaintiff's Response, the Reply and all accompanying materials, and this matter is now ready for disposition.

## II.  LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."[84]  An issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[85]  In examining these motions, all inferences must be drawn in the light most favorable to the nonmovants, and their allegations must be treated as true whenever they conflict with those of the

---

[81] The Court granted Plaintiff leave to amend her Complaint "to include a malicious prosecution claim under ONLY the First, Fourth, Sixth and Fourteenth Amendments" to the United States Constitution."  Order, August, 20, 2007.  Count III of Plaintiff's Amended Complaint alleges that Plaintiff was injured as a result of Defendants' violations of her rights under the First, Fourth, Sixth and Fourteenth Amendments.  Am. Compl. II ¶ 59.  Section 1983 "provides a private right of action against anyone who, acting under the color of state law, deprives another of 'any rights, privileges, or immunities secured by the Constitution and laws of the United States."  Dee v. Borough of Dunmore, 549 F.3d 225, 229 (3d Cir. 2008) (quoting 42 U.S.C. § 1983).  Defendants do not dispute that their alleged actions would qualify as acting under the color of state law.  Therefore, the Court will construe Count III of Plaintiff's allegations as arising under § 1983.

[82] Defendants mistakenly include in Plaintiff's remaining claims a Title VII claim against Defendant Algarin, as well as an abuse of process claim.  Plaintiff was not granted leave to amend her Complaint to bring such claims, see Order, August 20, 2007, nor does her Amended Complaint attempt to do so, see Am. Compl. II.

[83] As Plaintiff does not have an abuse of process claim, the Court will not address Defendants' arguments for summary judgment on the same.

[84] FED. R. CIV. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[85] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

movants and are supported by proper proofs.[86]   The Court will not, however, make any credibility

determinations or weigh the evidence presented.[87]

The party moving for summary judgment bears the initial burden of demonstrating that there

are no genuine issues of material fact.[88]   Once the movant has done so, the opposing party cannot rest

on its pleadings.[89]   To defeat summary judgment, the nonmovant must come forward with probative

evidence demonstrating the existence of genuine issues for trial.[90]   The nonmovant therefore must

raise "more than a mere existence of a scintilla of evidence in its favor" for elements on which it

bears the burden of production.[91]   An inference based upon speculation or conjecture will not create

a material fact.[92]

## III.  DISCUSSION

A.      *§ 1983 Claims for Violations of Plaintiff's First and Fourteenth Amendment Rights*

As an initial matter, Defendants argue that Plaintiff's claims are subject to and barred by a

two-year statute of limitations.[93]   While it is true that Plaintiff's § 1983 claims are subject to a two

---

[86] Kopec v. Tate, 361 F.3d 772, 775 (3d Cir. 2004).

[87] Goodman v. Pa. Tpk. Comm'n, 293 F.3d 655, 665 (3d Cir. 2002) (quoting Reeves v. Sanderson Plumbing Prods., 560 U.S. 133, 150 (2000)).

[88] FED. R. CIV. P. 56(c).

[89] Celotex, 477 U.S. at 324.

[90] Id. at 323-24.

[91] Anderson, 477 U.S. at 252.

[92] Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990).

[93] Defs.' Reply Mem. at *22-24.

year period of limitations,[94] those claims are not barred by the same.  Plaintiff's claims did not accrue "so long as the potential for a judgment in the pending criminal prosecution continues to exist."[95] Thus, the statute of limitations only began to run on Plaintiff's § 1983 claims once the criminal matter against her terminated.  The criminal matter against Plaintiff terminated on August 12, 2005 and she moved for leave to amend her complaint on March 2, 2007.[96]  Thus, these claims are not barred by the statute of limitations.

Moving on to the merits of Plaintiff's claims, to prevail on each claim brought under § 1983, she must demonstrate that a state actor deprived her of a federally protected right.[97]  To succeed on a claim of malicious prosecution under § 1983, a plaintiff must first establish an underlying violation of a constitutional right.[98]  As for her claim under the Fourteenth Amendment, Plaintiff has not demonstrated any underlying constitutional violation.  Although Plaintiff does not specify which clause of the Fourteenth Amendment gives rise to her claim, a claim like hers can be based on "the procedural component of the Due Process Clause, so long as it was not based on substantive due process."[99]  Malicious prosecution claims "must show more than a substantive due process

---

[94] Sameric Corp. of Del., Inc. v. City of Philadelphia, 142 F.3d 582, 599 (3d Cir. 1998).

[95] Smith v. Holtz, 7 F.3d 108, 113 (3d Cir. 1996).

[96] See Defs.' Reply Mem. at *23.

[97]  Wilson v. Russo, 212 F.3d 781, 786 (3d Cir. 2000).

[98] E.g., Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 792 (3d Cir. 2000).

[99] Id. (citing Torres v. McLaughlin, 163 F.3d 169, 173 (3d Cir. 1998)).

violation."[100]  Yet, Plaintiff produces no evidence that she was denied due process of law.[101]  Nor did the Court, in its independent review of the evidence adduced by the parties, identify any violations of Plaintiff's right to procedural due process.   Therefore, Plaintiff's § 1983 claim under the Fourteenth Amendment will be dismissed.

In contrast, Plaintiff has provided sufficient evidence of an underlying violation of the First Amendment upon which to base her malicious prosecution claim.  As noted in this Court's July 2, 2008 Memorandum Opinion, it is well established that "[t]he protection [the First Amendment] affords . . . applies both to petitioning state agencies and to petitioning state courts."[102]  Moreover, the Third Circuit has consistently held that suing an employer is activity protected under the First Amendment, as long as the petition is not frivolous or a "sham."[103]  Defendant does not contend or set forth evidence that Plaintiff's sexual harassment suit is either frivolous or a sham.  Therefore, there is an underlying constitutional violation for Plaintiff's First Amendment malicious prosecution claim.

If a plaintiff establishes a constitutional violation, then she must also establish the elements of a Pennsylvania malicious prosecution claim, which requires a showing that: 1) defendants initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was

---

[100] Gallo v. City of Philadelphia, 161 F.3d 217, 221 (3d Cir. 1998) (noting that malicious prosecution is not in and of itself a violation of substantial due process).

[101] Burns v. Pa. Dep't of Corrections, 544 F.3d 279, 285 (3d Cir. 2008).

[102] Mem. Op. and Order, July 2, 2008 at *6 (quoting Herr v. Pequea Twp., 274 F.3d 109, 115 (3d Cir. 2001), abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Tp. of Warrington, Pa., 316 F.3d 392, 400 (3d Cir. 2003)).

[103] Mem. Op. and Order, July 2, 2008 at *6 (citing Hill v. Borough of Kutztown, 455 F.3d 225, 242 n.24 (3d Cir. 2006) (citing Brennan v. Norton, 350 F.3d 399, 417 (3d Cir. 2003); San Filippo v. Bongiovanni, 30 F.3d 424, 434-43 (3d Cir. 1994))).

initiated without probable cause; and (4) defendants acted maliciously or for a purpose other than bringing the plaintiff to justice.[104]  Defendants do not dispute that the criminal proceeding against Plaintiff terminated in her favor.[105]

Pennsylvania law on malicious prosecution is based upon the Restatement (Second) of Torts.[106]  Under Section 563, a person can be liable for malicious prosecution if that person either "initiates or procures the institution of criminal proceedings against another."[107]  Defendants argue that they did not initiate any charges against Plaintiff.[108]  Yet, if an individual gives a public official information of another's supposed criminal misconduct knowing that information to be false, then the individual procured any resulting prosecution.[109]  If an individual induces a third person to knowingly provide the false information, a claim for malicious prosecution is still viable against that individual.[110]  The knowing provision of false information renders "an intelligent exercise of the [public official's] discretion . . . impossible," whether that information is provided by a defendant

---

[104] Merkle, 211 F.3d at 792.

[105] See Haefner v. Burkey, 626 A.2d 519, 521 (Pa. 1993) (finding that a criminal action that ended with the entry of *nolle pros* ended in the plaintiff's favor); see also Hilfirty v. Shipman, 91 F.3d 573, 579-80 (3d Cir. 1996) (holding that Haefner indicates a grant of *nolle prosequi* can satisfy the favorable termination requirement of a malicious prosecution claim).

[106] Hess v. Lancaster County, 514 A.2d 681 (Pa. Commw. Ct. 1986) (citing Neczypor v. Jacobs, 169 A.2d 528 (Pa. 1961)); see also Campbell v. Yellow Cab Co., 137 F.2d 918, 920 n.1 (3d Cir. 1942).

[107] RESTATEMENT (SECOND) OF TORTS § 653 (2008).

[108] Defs.' Reply Mem. at *24-*26.

[109] RESTATEMENT (SECOND) OF TORTS § 653 cmt. g; see Hess, 514 A.2d at 683-84; see also Griffiths v. Cigna Corp., 988 F.2d 457, 464 (3d Cir. 1993).

[110] See RESTATEMENT (SECOND) OF TORTS § 653 cmt. d (holding liable an individual "who procures a third person to institute criminal proceedings against another . . . under the same conditions as though he had himself initiated the proceedings); cmt. f (holding an individual liable even though he did not make the formal charge himself, but rather "induced a third person to make the charge").

directly or the defendant induces others to do the same.[111]

Plaintiff has produced sufficient evidence to create a genuine issue of material fact as to whether Defendants Algarin and Roth induced inmates to knowingly provide false information to public officials, ultimately resulting in criminal charges against Plaintiff.  Mascione first made his allegations against Plaintiff at approximately the same time he was written up for possession of contraband.  The resulting misconduct report was never logged.  When he violated furlough, Mascione wrote several letters to Defendant Algarin asking for help and referencing his testimony against Plaintiff.  Defendant Algarin did recommend that Mascione not lose his good time.  Drawing all inferences in Plaintiff's favor, a reasonable juror could believe that Mascione fabricated his allegations against Plaintiff in exchange for Defendant Algarin's help.  Three former inmates of MCCF testified that DiSanto said he was lying about Plaintiff so that "they" would help him get immediate work release or not serve more time in jail.  A reasonable juror could believe that "they" included Defendants Algarin and Roth.  Moreover, Defendant Roth ultimately recommended DiSanto for early parole.  Hence, a reasonable juror could believe that DiSanto lied about Plaintiff so that Defendants Algarin and Roth would help him get out of jail sooner.  Thus, there is a genuine issue of material fact as to whether Defendants Algarin and Roth procured the institution of criminal proceedings against Plaintiff, and summary judgment will not be granted on that basis.

With regard to the remaining elements of Plaintiff's malicious prosecution claim, probable cause is "proof of facts and circumstances that would convince a reasonable, honest individual that the suspected person is guilty of a criminal offense."[112]  Yet, it "does not depend on the state of the

---

[111] Id. § 653 cmt. g.

[112] Lippay, 996 F.2d at 1502 (citing Griffiths, 988 F.2d at 464; Bruch v. Clark, 507 A.2d 854, 857 (Pa. Super. Ct. 1986)).

case in point of fact but upon the honest and reasonable belief of the party prosecuting."[113]  Malice is "defined as 'ill will in the sense of spite, lack of belief by the actor himself in the propriety of the prosecution, or its use for an extraneous improper purpose,'" and may be inferred from the absence of probable cause.[114]  Defendants are not entitled to, nor do they argue for, a grant of summary judgment based on Plaintiff's failure to establish a lack of probable cause and malice.

In addition to producing sufficient evidence for a reasonable juror to find that Defendants Algarin and Roth induced inmates to lie about Plaintiff, CO Dillman testified in his deposition that Glenn had warned him that Defendant Algarin was watching him.  It is disputed whether Defendant Algarin stated "Well, I got to do what I got to do," after Plaintiff told him she was going to continue with her lawsuit against him.[115]  Moreover, CO Dillman testified that Defendant Roth told him to advise Plaintiff to drop her sexual harassment claim and mentioned that there would be criminal action against Plaintiff.  From this evidence, a reasonable juror could find that the charges against Plaintiff were procured by Defendants Algarin and Roth to dissuade her from bringing and continuing her sexual harassment suit against Defendant Algarin, and not because either Defendant Roth or Algarin believed Plaintiff guilty of the charges levied against her.  Thus, Plaintiff has produced sufficient evidence of a lack of probable cause and malice to survive summary judgment. As there are genuine issues of material fact precluding summary judgment on Plaintiff's § 1983 claim for malicious prosecution in violation of the First Amendment, the Court will not grant summary

---

[113] Lippay, 996 F.2d at 1502 (quoting Miller v. Pennsylvania R.R. Co., 89 A.2d 809, 811 (Pa. 1952)).

[114] Lippay, 996 F.2d at 1502 (quoting Lee v. Mihalich, 847 F.2d 66, 70 (3d Cir. 1988); Griffiths, 988 F.2d at 463; Kelly v. General Teamsters, Local Union 249, 544 A.2d 940, 941 (Pa. 1988); Hugee v. Pennsylvania R.R. Co., 101 A.2d 740, 743 (Pa. 1954)).

[115] Id. at 421:16-422:19.

judgment on the same.

    B.    *§§ 1985 and 1986 Claims for Conspiracies to Interfere with Plaintiff's Civil Rights*

    Plaintiff asserts claims against Defendants Algarin and Roth under subsections (2) and (3) of § 1985 for conspiring to interfere with her civil rights and under § 1986 for neglecting to prevent the same.[116]   Defendants argue that Plaintiff's § 1985 claims must fail as she has adduced no evidence in support thereof.[117]   Without an underlying § 1985 claim, Defendant argues that Plaintiff's § 1986 claim must also fail.[118]   While the Court will grant Defendants summary judgment on Plaintiff's § 1985(3) claim and portions of her § 1985(2) claim, it will not grant summary judgment on Plaintiff's § 1985(2) claim relating to a conspiracy to intimidate a party, nor on her § 1986 claim.

    **1.   § 1985(3) Claim**

    To state a claim under 42 U.S.C. § 1985(3),[119] the plaintiff must allege: "(1) a conspiracy;

---

[116] Am. Compl. II ¶ 31.

[117] Defs.' Reply Mem. at *18-*20.

[118] Id. at *21.

[119] 42 U.S.C. § 1985(3) provides:

> (3) Depriving persons of rights or privileges
>
> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United

(2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or deprivation of any right or privilege of a citizen of the United States."[120]  Yet, "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action."[121]  Although the Amended Complaint alleges that "Defendants Algarin [and] Roth . . . conspired to injure, oppress, and intimidate Mayfield because of her sex," Plaintiff has produced no evidence of such an intention.[122]  Plaintiff has produced no evidence of an animus on the part of Defendants Algarin and Roth against women in general, rather than against just Plaintiff as an individual.[123]  Thus, as there are no genuine issue of material fact regarding discriminatory animus, Defendants are entitled to judgment as a matter of law.  The Court will grant Defendants summary judgment on Plaintiff's § 1985(3) claim.

> ### 2.       § 1985(2) Claim

To establish a claim under § 1985(2), a plaintiff must allege one of the statute's two bases for recovery: 1) a conspiracy to "deter by force, intimidation or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein

---

States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

[120] Farber v. City of Paterson, 440 F.3d 131, 134 (3d Cir. 2006) (quoting United Bhd. of Carpenters & Joiners v. Scott, 463 U.S. 825, 828-29 (1983)).

[121] Kush v. Rutledge, 460 U.S. 719, 726 (1983) (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)); Farber, 440 F.3d 135.

[122] Am. Compl. II ¶ 32.

[123] See Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 269-70 (1993).

19

. . . "; or 2) a conspiracy with the purpose of "impeding, hindering, or obstructing, or defeating in any manner, the due course of any justice in any State or Territory, with intent to deny any citizen the equal protection of the laws."[124]  As stated in the Court's July 2, 2008 Memorandum Opinion, Plaintiff asserts claims under both portions of § 1985(2).[125]  Yet, like a § 1985(3) claim, a claim for conspiracy to obstruct justice under the latter portion of § 1985(2) also requires Plaintiff to show a "class-based, invidiously discriminatory animus."[126]  As explained *supra*, Plaintiff has not made such a showing.[127]  Therefore, the Court will grant Defendants summary judgment on Plaintiff's § 1985(2) claim for conspiracy to obstruct justice.

With respect to the first half of § 1985(2), the essential elements of a § 1985(2) claim of witness intimidation are: 1) a conspiracy between two or more persons; 2) to deter a witness by force, intimidation or threat from attending court or testifying freely in any pending matter; which 3) results in injury to the plaintiff.[128]  Plaintiff has failed to produce any evidence linking Defendants Algarin and Roth to any claimed intimidation of her witnesses.[129]  Thus, the Court will grant Defendants summary judgment on Plaintiff's § 1985(2) claims arising from witness intimidation.

Plaintiff has, however, produced sufficient evidence for a reasonable juror to find that

---

[124] 42 U.S.C. § 1985(2).

[125] Mem. Op. and Order, July 2, 2008 at *12.

[126] People ex rel. Snead v. Kirkland, 462 F. Supp. 914, 920-21 (E.D. Pa. 1978) (quoting Brawer v. Horowitz, 535 F.2d 830, 840 (3d Cir. 1976)).

[127] See, supra Part III.B.1.

[128] Malley-Duff & Assocs. v. Crown Life Ins. Co., 792 F.2d 341, 356 (3d Cir. 1986).

[129] All alleged incidents of witness intimidation were attributed to individuals other than Defendants Roth and Algarin.  Plaintiff adduced no proof of any incidents of intimidation of Plaintiff's witnesses by either Defendant Roth or Defendant Algarin, nor any evidence linking Defendants Roth and Algarin to the individuals claimed to have intimidated Plaintiff's witnesses.  Thus, there is no evidence of a conspiracy between Defendants Roth and Algarin to intimidate Plaintiff's witnesses and the Court will dismiss that claim.

Defendants Algarin and Roth have conspired to intimidate her as a party in her sexual harassment claim. She testified that Defendants Algarin and Roth were very close and that Defendant Roth was grooming Defendant Algarin to replace him. A reasonable juror could believe, based on CO Dillman's testimony, that Defendant Roth threatened Plaintiff with criminal charges unless she dropped her suit against Defendant Algarin. Finally, Plaintiff produced evidence of favorable treatment accorded inmates who testified against her by both Defendants Algarin and Roth. Thus, a reasonable juror could find that Defendants Algarin and Roth agreed to intimidate Plaintiff by manufacturing criminal charges against her. As there are genuine issues of material fact for trial, the Court will not grant Defendants summary judgment on Plaintiff's § 1985(2) claim relating to the intimidation of Plaintiff as a party in her sexual harassment claim.

### 3.     § 1986 Claim

In order to make out a claim under § 1986,[130] the companion statute to § 1985, an underlying § 1985 claim must be successfully alleged as a prerequisite.[131] As explained *supra*, part of Plaintiff's § 1985(2) claim will survive summary judgment. Therefore, Defendant's argument that Plaintiff's

---

[130] 42 U.S.C. § 1986 provides:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall be liable to such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.

[131] E.g., Coggins v. McQueen, 447 F. Supp. 960, 966 (E.D. Pa. 1978).

21

§ 1986 claim should be dismissed because she has failed to establish a viable § 1985 claim is without

merit.  Thus, the Court will not grant Defendants summary judgment on Plaintiff's § 1986 claim.

## IV.    CONCLUSION

Plaintiff has failed to establish an underlying constitutional violation for her § 1983 malicious

prosecution claim under the Fourteenth Amendment, and summary judgment will be granted on that

claim.  There are, however, genuine issues of material fact with respect to her § 1983 malicious

prosecution claim under the First Amendment, and summary judgment will not be granted on that

claim.  Plaintiff has not produced evidence of any class-based, invidiously discriminatory animus

on behalf of Defendants Roth and Algarin.  Therefore, her claims for conspiracy under § 1985(3),

and for conspiracy to obstruct justice under § 1985(2) must fail.  Plaintiff also has not produced

evidence of a conspiracy between Defendants Roth and Algarin to intimidate her witnesses, so her

claim of a conspiracy to intimidate witnesses under § 1985(2) must fail as well.  Plaintiff has

produced sufficient evidence of a conspiracy between Defendants Roth and Algarin to intimidate

Plaintiff herself, and therefore her claim of conspiracy to intimidate a party under § 1985(2) will

survive summary judgment.  Finally, as there is an underlying § 1985(2) claim, summary judgment

will be denied on Plaintiff's § 1986 claim.

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **EILEEN MAYFIELD,** | ) | |
| | ) | |
| **Plaintiff**, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | **No. 03-cv-2234** |
| | ) | |
| **MONTGOMERY COUNTY** | ) | |
| **CORRECTIONAL FACILITY, et al.,** | ) | |
| | ) | |
| **Defendants**. | ) | |

---

## ORDER

　　**AND NOW**, this 12th day of February 2009, upon consideration of Defendants'
Motion for Partial Summary Judgment [Document No. 106], Plaintiff's Response [Document No.
109] and Defendants' Reply [Document No. 110], and in accordance with the attached Memorandum
Opinion, it is hereby **ORDERED** that Defendants' Motion is **GRANTED IN PART** and **DENIED
IN PART**, as follows:

1.　　Defendants' Motion is **GRANTED** as to Plaintiff's claim under § 1983 for malicious
prosecution in violation of the Fourteenth Amendment.  Accordingly, this claim is
**DISMISSED**;

2.　　Defendants' Motion is **DENIED** as to Plaintiff's claim under § 1983 for malicious
prosecution in violation of the First Amendment;

3.　　Defendants' Motion is **GRANTED** as to Plaintiff's claims under § 1985(2) for
conspiracy to intimidate witnesses and conspiracy to obstruct justice.  Accordingly,
these claims are **DISMISSED**;

4.　　Defendants' Motion is **DENIED** as to Plaintiff's claim under § 1985(2) for

conspiracy to intimidate a party;

5.     Defendants' Motion is **GRANTED** as to Plaintiff's claim under § 1985(3).

Accordingly, this claim is **DISMISSED**;

6.     Defendants' Motion is **DENIED** as to Plaintiff's claim under § 1986.

Plaintiff's remaining claims are a Title VII claim against Defendant Montco; PHRA claims against Defendants Montco and Algarin; and a claim against Defendants Algarin and Roth under 42 U.S.C. § 1983 for malicious prosecution in violation of the First Amendment.  Plaintiff also maintains claims against Defendants Algarin and Roth under 42 U.S.C. § 1985(2) for conspiracy to intimidate a party, and under 42 U.S.C. § 1986.

It is so **ORDERED**.

**BY THE COURT:**

**/s/ Cynthia M. Rufe**

_____

**CYNTHIA M. RUFE, J.**